## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TRAY, INC.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 21-1254** |
| | : | |
| **DEVON INTERNATIONAL GROUP,** | : | |
| **INC., *et al.*** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                            **May 3, 2021**

A company buying over seven million dollars of personal protective equipment for its health care customers at the outset of the COVID-19 pandemic last April may sue responsible parties when their purchased products do not arrive consistent with its expectation. The purchasing company faces a more difficult task in suing the sellers' officer or trying to turn a breach of contract claim into a fraud or conversion claim. We recognize a purchaser waiting for a refund of over seven million dollars for undelivered products may wish to hold as many people responsible for its lost purchase money as possible. But the purchaser must plead facts allowing it to proceed against the sellers' officers or on theories beyond breach of contract. We today grant an individual owner of he sellers' motion to dismiss claims against him as well as a partial motion to dismiss tort claims. We also strike scandalous and impertinent introductory paragraphs in the amended Complaint. The disappointed purchaser may take discovery and possibly amend should it discover facts allowing it to hold the sellers' officer liable for an alleged breach of contract.

## I. Alleged facts

Dr. John A. Bennett and his wife Nance DiRocco formed a group of entities: Devon International Group, Inc., DMD Medical Group, Inc., and Devon MD, LLC.[1] Devon International markets itself as a multinational group of nine healthcare, information technology, manufacturing, and industrial businesses, which employs over 500 people in twenty countries.[2] Devon International owns DMD Medical and Devon MD as subsidiaries.[3] The Devon Entities "appear to be affiliated business enterprises with common ownership, common management, common business purpose, and common assets."[4] All Devon Entities operate from the same office in King of Prussia, PA.[5]

### Tray orders personal protective equipment from the Devon Entities.

Within weeks of the COVID-19 pandemic causing widespread shutdown of the United States, Dr. Bennett used his Devon International email address to promote Devon International's ability to manufacture and deliver personal protective equipment ("PPE") to representatives of Tray, International, Inc. Tray offers no detail regarding its business aside from alleging it is a Maryland corporation servicing clients including the University of Maryland Baltimore Washington Medical Center, Main Line Health, Ann Arundel Medical Center, and Doctors Community Hospital, the Maryland Department of Health, and Facebook.[6]

Dr. Bennett solicited orders for PPE.[7] Dr. Bennett said a supplier in China could immediately fulfill Tray's current PPE needs and a manufacturer in China could produce 100,000 units per day to fulfill Tray's future PPE needs.[8] Tray does not allege Dr. Bennett made specific representations about when Devon International would deliver the PPE.

Tray submitted eight purchase orders to Devon International in April 2020 agreeing to pay more than $7.3 million to obtain over 1.9 million units. Tray's purchase orders specified the price, quantity, type of PPE, and ship date:

| Date of PO | Quantity | Ship Date | Price (Shipping Included) |
|---|---|---|---|
| April 6, 2020 | 100,000 gowns | April 18, 2020 | $530,000.00 |
| April 6, 2020 | 50,000 gowns | April 6, 2020 | $265,000.00 |
| April 6, 2020 | 50,000 gowns | April 6, 2020 | $265,000.00 |
| April 9, 2020 | 500,000 gowns | April 20, 2020 | $2,950,000.00 |
| April 9, 2020 | 200,000 gowns | April 9, 2020 | $1,180,000.00 |
| April 9, 2020 | 200,000 gowns | April 9, 2020 | $1,380,000.00 |
| April 15, 2020 | 350,000 masks | April 15, 2020 | $280,000.00 |
|  | 30,000 gowns | May 1, 2020 | $210,000.00 |
| April 21, 2020 | 500,000 masks | April 21, 2020 | $175,000.00 |

Tray's purchase order did not specify an expected delivery date or whether the units would ship by air or by boat from China. Devon MD invoiced Tray. At Dr. Bennett's instructions, Tray wired the purchase funds to a DMD Medical bank account.[9] Dr. Bennett confirmed on April 11, 2020 the first 200,000 gowns would ship on April 15 and 16, 2020.[10] He confirmed on April 13, 2020 he had already shipped another 200,000 units.[11] Dr. Bennett further confirmed he filled three additional orders on April 15, 2020 and would partially fill another order on April 19, 2020.[12] But aside from his own say-so, Dr. Bennett did not provide tracking information or other evidence he filled the orders despite Tray's requests to do so.[13]

When Tray had not received any of its orders by April 24, 2020, its customers began to complain.[14] Tray reached out to Dr. Bennett asking for updates on the status of the orders.[15] Dr.

Bennett responded by telling Tray 420,000 units would ship between April 24 and April 28, 2020.[16] Dr. Bennett would not provide tracking information or other evidence of shipment.[17]

Four days passed, and Tray, still without its ordered PPE, reached out to Dr. Bennett again seeking confirmation the orders had shipped.[18] Tray then terminated the purchase orders on April 28, 2020—around three weeks after it placed its first order—and sought a refund for the $7,356,500.00 it had paid.[19] Dr. Bennett refused to return the money.[20] To date, Tray has received neither the PPE it ordered eleven months ago nor a refund.[21] There is no allegation regarding what happened with the PPE allegedly ordered from China.

## II.    Analysis

Tray now sues Ms. DiRocco, Dr. Bennett, and the Devon Entities for breach of contract, fraud, negligent misrepresentation, conversion, and unjust enrichment. Dr. Bennett and the Devon Entities move to partially dismiss, arguing: (1) Dr. Bennett cannot be held personally liable for the actions he took on behalf of the Devon Entities; (2) the gist of the action doctrine bars Tray's tort claims; (3) Tray fails to plead fraud with particularity under Federal Rule of Civil Procedure 9(b); and, (4) Tray cannot prevail on an unjust enrichment claim because of the contract between the parties.[22] Dr. Bennett and the Devon Entities further move to strike the allegations in paragraphs 1 and 2 of the amended Complaint as impertinent and scandalous.[23] They do not move to dismiss the breach of contract claims against each of the Devon Entities.

Tray argues we may hold Dr. Bennett personally liable because the Devon Entities act as his alter ego, he participated in the alleged misconduct, and he is a party to the contracts with Tray. Tray argues Maryland law does not recognize the gist of the action doctrine, and its tort claims would survive even if the gist of the action doctrine applied. Tray further argues it pleads its fraud claims with particularity and dismissal of its unjust enrichment claims is premature at

this stage. Tray also argues we should not strike the first two paragraphs of its amended Complaint.

We first assess whether Tray alleged sufficient facts to impose personal liability on Dr. Bennett. As we find Tray failed to plead sufficient facts to pierce the corporate veil to impose personal liability on Dr. Bennett or prevail on a participation theory, we dismiss Tray's claims against Dr. Bennett without prejudice. We then assess whether the gist of the action bars Tray's tort claims. We must decide whether Pennsylvania and Maryland law conflict regarding the gist of the action doctrine and whether Tray's allegations sound in contract or tort. We find no conflict between Maryland and Pennsylvania law. We find the gist of the action doctrine bars Tray's tort claims. As we find Tray's fraud claim barred, we do not assess whether Tray pleads fraud with particularity under Rule 9(b). We find dismissal of Tray's unjust enrichment claim is premature without knowing whether the Devon Entities will dispute the existence, enforceability, or validity of the contract between the parties. We strike paragraphs one and two of the amended Complaint as scandalous and impertinent.

### A. We dismiss the claims against Dr. Bennett without prejudice.

Tray seeks to impose personal liability on Dr. Bennett arguing he is the alter ego of the Devon Entities; participated in the alleged misconduct; and, is a party to the contract. Dr. Bennett argues Tray pleads insufficient facts to prevail on an alter ego theory, the participation theory does not apply because he acted on behalf of an entity, and he is not a party to the contract. We find Tray fails to suffiently plead facts to maintain a claim against Dr. Bennett under Pennsylvania law.

1. **We apply Pennsylvania law to determine whether we may hold Dr. Bennett personally liable to Tray.**

A federal court sitting in diversity must apply the choice of law rules of the state in which it sits.[24] Under Pennsylvania law, the question of whether we may impose liability on corporate officers is governed by the law of the state of the entity's incorporation or the state of organization for a limited liability company.[25] We apply Pennsylvania law as all of the Devon Entities are organized or incorporated under Pennsylvania law.[26]

2. **Tray fails to plead the Devon Entities are Dr. Bennett's alter ego.**

Tray has not pleaded facts warranting our piercing the corporate veil. "As a general rule, members of a limited liability company or shareholders of corporations are 'not personally liable to perform corporate obligations.'"[27] But we may disregard the corporate form "whenever justice or public policy demand and when the rights of innocent parties are not prejudiced nor the theory of the corporate entity rendered useless."[28] "Pennsylvania courts presume the legitimacy of the corporate form and will not pierce the corporate veil unless exceptional circumstances warrant such an exceptional remedy."[29] To determine whether we should pierce the corporate veil, we consider several factors, including: "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetrate a fraud."[30] "These factors are not exhaustive, nor is every element required for a finding of liability; however, the situation must present 'an element of injustice or fundamental unfairness.'"[31] "[A]verments reciting elements of the veil-piercing test, without any supporting facts, constitute legal conclusions. Even under a notice pleading standard, as interpreted in *Twombly*, such averments cannot support a veil-piercing claim."[32]

In *Partners Coffee Co., LLC v. Oceana Services and Products Co.*, Judge Standish analyzed whether a plaintiff pleaded sufficient facts to warrant piercing the corporate veil under

Pennsylvania law.[33] After an acquisition, the buyer and seller countersued each other for fraud and breach of contract.[34] The seller brought suit against the buyer-corporation, a related entity, and the president of both the buyer-corporation and the related entity.[35] The president and the related entity moved to dismiss the claims against them, arguing only the buyer-corporation could be held liable. The seller, seeking to pierce the corporate veil, alleged, "[the buyer-corporation] failed to observe corporate formalities or keep proper company records; [the buyer-corporation] had no officers or other members other than the [related entity's] officers and directors; and [the related entity and president] diverted assets of [the buyer corporation] for their own personal use."[36] The seller further alleged, "[the buyer-corporation] was insufficiently capitalized; there was an intermingling of funds between [the related entities'], [the buyer corporation] and [the president] personally; [the buyer-corporation's] officers, managers and directors, if any, did not function; [the buyer-corporation] did not pay distributions in the ordinary course of business; and [the president and/or the related entity] held themselves out as conducting business affairs without the use of company names and without identifying that their actions were taken as an officer or manager of [the buyer-corporation]."[37]

Judge Standish dismissed the claims against the related entity and the president without prejudice. He reasoned the allegations against the president and the related entity were nothing "more than a recitation of the elements necessary to hold [them] liable under the piercing of the veil theory or the alter ego theory."[38] But Judge Standish permitted the seller "to amend their [claims] to cure the shortcomings of their initial pleading."[39]

In *Clientron Corp. v. Devon IT, Inc.*, Judge Baylson dismissed claims against Dr. Bennett, finding the plaintiff failed to plead sufficient facts to pierce the corporate veil and hold Dr. Bennett liable under an alter-ego theory for Devon IT's actions.[40] But Judge Baylson

nevertheless granted discovery on the issue of alter-ego liability and granted leave to file an amended complaint against Dr. Bennett if discovery yielded evidence supporting alter ego liability.[41]

Tray alleges: (1) "the Devon Entities are sham companies that were used to perpetrate a fraud on [Tray]and evade creditors by using insolvent and judgment-proof companies"; (2) "[Devon International] is a non-operating entity with no employees or subsidiaries and no assets"; (3) "The Devon Entities . . . intentionally intermingle their businesses together, and serve as alter egos for . . . for Bennett and DiRocco"; (4) "The Devon Entities appear to be insolvent based upon . . . their failure to return any portion of the funds that [Tray] paid for PPE that was never received, including substantial shipping charges"; and (5) "[u]pon information and belief, the Devon Entities failed to observe corporate formalities, failed to maintain capital reserves for paying creditors and generally operated so that they were nothing more than sham companies disguising the use of their assets."[42]

While Tray may allege sufficient facts to impose liability on the various Devon Entities rather than just Devon International,[43] its allegations regarding Dr. Bennett are insufficient  to pierce the corporate veil. The allegations "the Devon Entities . . . serve as alter egos . . . for Bennett" is a legal conclusion, and we must disregard it. Like the allegations in *Partners*, Tray's allegation "the Devon Entities . . . failed to observe corporate formalities, failed to maintain capital reserves and generally operated so that they were nothing more than sham companies" merely recite the elements of the veil piercing test and do not suffice under *Twombly*.

The only allegation we could construe as a fact, rather than a bare recitation of the elements, in support of veil-piercing provides: "[t]he Devon Entities appear to be insolvent based upon . . . their failure to return any portion of the funds [Tray] paid for his PPE."[44] This

allegation does not persuade us to pierce the corporate veil. We do not find the failure to refund a cancelled order sufficient to allege insolvency or undercapitalization. If we accepted Tray's argument, we would in essence be finding failure to perform under a contract constitutes *prima facie* evidence of insolvency or undercapitalization. And even if the allegation of nonperformance is sufficient to allege insolvency, our Court of Appeals instructs "insolvency, without more, is not a factor which can justify piercing a corporate veil." [45] Given the presumption of legitimacy limited liability companies and corporations enjoy under Pennsylvania law, we find Tray fails to allege sufficient facts to pierce the corporate veil and impose liability on Dr. Bennett.

But as Judge Baylson did in *Clientron*, we will allow Tray to seek discovery into the appropriateness of piercing the corporate veil, and we will grant leave to Tray to amend the complaint to resurrect its claims against Dr. Bennett if the evidence establishes a ground for imposing individual liability on him.

> **3.     Tray fails to plead liability against Dr. Bennett under a participation theory because there is no viable tort claim against him and he did not contract with Tray in his individual capacity.**

Tray seeks to hold Dr. Bennett liable for on his alleged participation in the alleged misconduct. As we discuss in more detail below,[46] Tray's tort claims are barred by the gist of the action doctrine and thus only Tray's breach of contract claim survives.  The participation theory does not apply given the limited scope of the participation theory in breach of contract cases.

"Pennsylvania law recognizes the participation theory as a basis of liability." [47] The Supreme Court of Pennsylvania described the participation theory as "[t[he general, if not universal, rule is that an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor; but that an officer of a corporation who takes no part in

the commission of the tort committed by the corporation is not personally liable to third persons for such a tort, nor for the acts of other agents, officers or employees of the corporation in committing it, unless he specifically directed the particular act to be done or participated or cooperated therein."[48] But the participation theory has limited applicability to breach of contract cases. [49] "Unless the corporate officer extends promises in his individual capacity, the participation theory does not apply in the context of an action for breach of contact." [50] "Whenever a corporation makes a contract, it is the contract of the legal entity—of the artificial being created by the charter—and not the contract of the individual members."[51]

Tray admits contracting with the Devon Entities and with not Dr. Bennett individually. Tray alleges Dr. Bennett used a Devon International email address to solicit orders. Dr. Bennett "promoted [Devon International's] capabilities, and those of the Devon entities." [52] He specifically represented Devon International "had an office located in China, which would help acquire the business relationships necessary to secure prompt shipping and competitive pricing for the PPE"; "through its corporate portfolio of subsidiaries (which includes the other Devon Entities), owned a production company located in China"; "could immediately fulfill [Tray's] requirements"; and, "would be able to fulfill any additional orders."[53] In other words, all of the alleged representations involved the capabilities of a Devon Entity, not Dr. Bennett himself. Tray submitted the purchase orders to Devon International, and in turn Devon MD invoiced Tray.[54] Tray wired the over $7 million in purchase funds to DMD Medical.[55] Tray does not allege it placed an order with Dr. Bennett directly or sent money directly to his personal account. Tray does not allege a contract with Dr. Bennett in his individual capacity. The participation theory does not apply. Tray's argument Dr. Bennett is a party to this contract fails for the same reasons.

**B.** **We dismiss Tray's negligent representation, fraud, and conversion claims under the gist of the action doctrine.**

The Devon Entities argue we should apply Pennsylvania law and dismiss Tray's tort claims under the gist of the action doctrine. Tray argues we should apply Maryland law, which Tray contends does not recognize the gist of the action doctrine. Tray alternatively argues the gist of the action doctrine does not bar its tort claims. We find no true conflict between Maryland and Pennsylvania law. We apply Pennsylvania law and Maryland law interchangeably and the gist of the action doctrine bars Tray's tort claims.

### 1. There is no conflict between Pennsylvania and Maryland law on the gist of the action doctrine.

We find no conflict between Pennsylvania and Maryland law regarding the gist of the action doctrine. Under Pennsylvania's choice of law rules, we must "first determine whether there is a relevant difference between the law of the jurisdictions whose laws potentially apply *i.e.*, whether there is a conflict."[56] "If the laws of the jurisdictions are the same, 'then there is no conflict at all, and a choice of law analysis is unnecessary.'"[57] "In the absence of a conflict, 'the district court sitting in diversity may refer interchangeably to the laws of the states whose laws potentially apply.'"[58] If the laws differ, we "must examine the interests and policies underlying the law of each jurisdiction and determine whether the conflict is 'true,' 'false,' or 'unprovided for.'"[59] "A false conflict exists only if one jurisdiction's governmental interests would be impaired by the application of another jurisdiction's laws."[60] If we find a false conflict, we "must apply the law of the only interested jurisdiction."[61] An "unprovided for" conflict exists if neither jurisdiction's interests would be impaired if its laws were not applied.[62] If we find an "unprovided for" conflict," we apply "the law of the place of the wrong."[63] A true conflict exists if both jurisdictions' interests would be impaired by the application of the other's laws.[64] If we

find a "true" conflict, we "must determine which state has the greater interest in the application of its law."[65] To determine which state has a greater interest, "we must weigh each state's contacts on a qualitative scare according to their relation to the policies and interests underlying the particular issue."[66]

We first assess whether Pennsylvania and Maryland law conflict regarding whether a plaintiff can recover in tort for a breach of contractual obligations. Under Pennsylvania's "gist of the action doctrine," "an alleged tort claim against a party to a contract based on the party's actions undertaken in the course of carrying out a contractual agreement, is barred when the gist or gravamen of the cause of action stated in the complaint, although sounding in tort, is, in actuality, a claim against the party for breach of its contractual obligations."[67] "If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—*i.e.*, a specific promise to do something that a party would not ordinarily have been obligated to do—then the claim is to be viewed as one for breach of contract."[68] But if "the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort."[69]

While Maryland courts do not employ the phrase "gist of the action," they have long recognized a similar doctrine.In *Mesmer v. Maryland Auto Insurance Fund*, the Court of Appeals of Maryland explained, "a contractual obligation, by itself, does not create a tort duty."[70] "Instead, the duty giving rise to a tort claim must have some independent basis."[71] "Mere failure to perform a contractual duty, without more, is not an actionable tort."[72] The Maryland Court of Appeals clarified, "[t]here is no single principle or simple test for determining when a defendant's breach of contract will also breach an independent duty and give rise to a tort action,"

but "when the dispute is over the existence of any valid contractual obligation covering a particular matter, or where the defendant has failed to recognize or undertake any contractual obligation whatsoever, the plaintiff is ordinarily limited to a breach of contract remedy."[73]

It is a general principle under Pennsylvania and Maryland law a plaintiff may not recover in tort for a defendant's breach of a contractual obligation. The tests for determining whether a claim truly sounds tort or contract require us to determine whether the duty the defendant breached arose from a contract or arose independently of the contract. As both jurisdictions recognize a plaintiff cannot recover for a defendant's breach of a contractual duty, we find no conflict between the law of Maryland and Pennsylvania, and we may refer to the laws of Pennsylvania and Maryland interchangeably. For ease of reference, we will refer to the principal recognized by both Pennsylvania and Maryland as the "gist of the action doctrine," though Maryland courts do not explicitly use this phrase.

###### 2. The gist of the action doctrine bars Tray's fraud, negligent misrepresentation, and conversion claims.

The Devon Entities move to dismiss Tray's fraud, negligent misrepresentation, and conversion claims as barred by the gist of the action doctrine given the pending breach of contract claims. We find the gist of Tray's action lies in contract and dismiss Tray's claims for fraud, negligent misrepresentation, and conversion.

The gist of the action doctrine bars tort claims "when the gist or gravamen of the cause of action stated in the complaint, although sounding in tort, is, in actuality, a claim against the party for breach of its contractual obligations."[74] When determining whether to apply the gist of the action doctrine, our Court of Appeals directs we must "examine the factual allegations and ask, "[w]hat's this case really about?"[75]

We are guided by our Court of Appeals affirming Judge McLaughlin's dismissal of a fraud claim under the gist of the action doctrine in *Downs v. Andrews*.[76] In *Downs*, the plaintiffs sought to purchase 171 mortgage notes from the defendants at a discount.[77] The plaintiffs gave the defendants $740,000 in advance of the sale.[78] Defendants timely delivered the first fifty-nine notes, but the rest did not arrive on time.[79] In total, the defendants only delivered $399,000 notes.[80] The plaintiffs filed a fraud claim against the defendants, and Judge McLaughlin dismissed the complaint under the gist of the action doctrine, finding the "heart" of plaintiffs' claim was the defendants' failure to deliver the mortgage notes owed under the contract.[81]

Our Court of Appeals affirmed. It explained "[t]his case is about Defendants' alleged failure to fulfill their contractual promises to deliver all of the purchased notes."[82] While the plaintiffs alleged the defendants failed to deliver the notes because the defendants never actually owned the notes despite their representations, our Court of Appeals found "the obligation to perform was the result of the contract."[83] The Court thus held, "regardless of Plaintiffs' assertions about why the notes were not delivered, the crux of their action is that Defendants failed to deliver the notes as required under the contract."[84]

Our Court of Appeals further explained, "[p]laintiffs cannot rescue their claim by attempting to cast their complaint as alleging breach of a different duty, such as fraud in the inducement[.]"[85] The court acknowledged, "Pennsylvania state and federal courts have reached different conclusions about whether the gist of the action doctrine applies to fraudulent inducement claims."[86] But the court found it "need[ed] not decide whether fraud in the inducement claims are categorically barred under the gist of the action doctrine because the pleadings demonstrate that the primary basis for alleging that fraudulent activity induced the contract is the fact that the notes were not delivered in accordance with the contract, not a failure

to fulfill a separate societal duty which may exist in other cases."[87] Our Court of Appeals concluded, "[b]ecause the 'nature of the duty' alleged to be violated arises out of Defendants' contractual promises to deliver the notes, and not a prior societal duty, we will affirm the District Court's dismissal of the complaint pursuant to the gist of the action doctrine."[88]

By contrast, in *Earl v. NVR, Inc.*, our Court of Appeals reversed a dismissal of an Unfair Trade Practices and Consumer Protection claim under the gist of the action doctrine.[89] In *Earl*, the plaintiff contracted with defendant to purchase a home, then under construction.[90] The defendant represented the home, when finished, "would contain 'quality architecture, timeless design, and beautiful finishes."[91] The defendant further represented: the home "would be constructed in a good and workmanlike manner"; the defendant "would remedy any deficiency [the plaintiff] encountered"; and the home "would be constructed in accordance with relevant building codes and standards."[92] When the defendant finished construction, the plaintiff moved in and soon encountered a number of material defects.[93] The plaintiff asked the defendant to repair the defects, but quickly realized the defendant could not make the necessary repairs.[94]

The plaintiff sued under Pennsylvania's Unfair Trade Practices and Consumer Protection Law, and the defendant moved to dismiss under the gist of the action doctrine.[95] Our Court of Appeals found the gist of the action doctrine inapplicable. The court explained plaintiff's "complaint is not primarily premised upon the terms of the contract, . . . but on the marketing and representations that induced her to enter into the contract in the first instance, as well as statements made to her by agents of [the defendant's] during the homebuilding process."[96] The court pointed to the "false representations . . . about the Home prior to the formation of the contract" and the "false representations after the contract period, once she moved into the house"

in support of its conclusion the alleged fraudulent actions "[were] collateral to the terms of the contract itself."[97]

Tray's allegations are more like those presented in *Downs* than those in *Earl*. Like in *Downs*, where the only alleged fact supporting plaintiff's fraud claim was the defendants' failure to deliver the mortgage notes owed, the sole fact Tray identifies to support a theory of fraud is the Devon Entities' failure to deliver the contracted-for PPE. While Tray alleges Dr. Bennett represented the Devon Entities' ability to fill Tray's PPE orders, his representations are similar to the alleged representations in *Downs*, where the defendant represented he had the notes and would deliver them.

Had Tray not cancelled the orders and still never received the PPE or received substandard quality PPE, this case would come closer to *Earl*. In *Earl*, when the plaintiff moved into the home, it was clear the home did not live up to the promises the defendant made to induce her into purchasing it. Dr. Bennett promised he had a factory in China capable of manufacturing and shipping PPE. Tray does not allege facts showing these factories did not exist and did not ship in accordance with Dr. Bennett's representations. Tray alleges only it did not receive the PPE within two weeks of the ship date—which were shipping from China to the United States in the early paralyzing grip of a pandemic—and thus it decided to cancel all PPE orders. Given Tray's cancellation of the orders, the fact it did not receive the orders is hardly surprising, let alone indicative Dr. Bennett and the Devon Entities never intended to fill Tray's orders and never shipped the ordered units.

Cognizant of our Court of Appeals' instruction to ask "what's this case really about?", we find this case is really about the Devon Entities' failure to deliver PPE in a timely manner as

contemplated by the parties' agreement. The gist of this action lies in contract, not in tort. We dismiss Tray's fraud, negligent misrepresentation, and conversion claims.

### C. We deny the Devon Entities' motion to dismiss the unjust enrichment claims.

Dr. Bennett and the Devon Entities move to dismiss the unjust enrichment claim, arguing "unjust enrichment claims are barred when the parties' relationship is governed by a contract, as plaintiff alleges is the case here."[98] Tray argues it is premature to dismiss the unjust enrichment claim until it is clear whether the Devon Entities will dispute the validity or enforceability of the contract.[99] The Devon Entities did not respond to this argument. We agree with Tray it is be premature to dismiss the unjust enrichment claim until we know whether the Devon Entities plan to dispute the existence, validity, or enforceability of a contract between the parties.[100]

Judge DuBois's reasoning in *Slemmer v. McGlaughlin Spray Foam Insulation, Inc.*, guides us. In *Slemmer*, the defendant moved to dismiss the plaintiffs' unjust enrichment claims, arguing the impropriety of a claim for unjust enrichment in light of the written contract between the parties.[101] While Judge DuBois acknowledged, "[t]he doctrine of unjust enrichment is inapplicable when the relationship between the parties is founded upon a written agreement or express contract," he nevertheless denied the motion.[102] He explained, "plaintiffs have not admitted that a valid contract existed between the parties."[103] "Given that plaintiffs are permitted to plead in the alternative, 'it is premature at this juncture to dismiss the unjust enrichment claim.'"[104]

The Devon Entities have not answered, and they did not provide assurances in their reply brief they do not intend to challenge the existence, enforceability, or validity of a contract between the parties. We find it premature at this stage to dismiss the unjust enrichment claim.

**D.      We strike paragraphs one and two of the amended Complaint.**

The Devon Entities move to strike paragraphs one and two of the amended Complaint, arguing they are "immaterial, impertinent, and scandalous." Tray alleges in paragraph one: "In the early stages of the COVID-19 pandemic, while brave healthcare workers were risking their lives as the novel coronavirus was overwhelming hospitals across the country, there were scammers and con artists who saw an opportunity with respect to the scarce PPE."[105] Tray alleges in paragraph two: "According to a press release issued by the FBI on April 13, 2020, the environment at the time was 'ripe for fraudulent actors perpetrating advance fee [and other] schemes,' since the demand for PPE far outweighed the supply."[106]

A party may move to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."[107] This rule is "designed to reinforce the requirement in Rule 8 . . . that pleadings be simple, concise, and direct."[108] The purpose of a motion to strike should be to "clean up the pleadings, streamline litigation, and avoid the unnecessary forays into immaterial matters."[109] "Motions to strike should not be used to persuade a court to determine disputed questions of law."[110] "They also 'may not serve as an avenue to procure the dismissal of all or part of a complaint.'"[111] The burden rests with the moving party to show that the challenged matter should be stricken.[112]The movant must demonstrate that the matter falls within one of the categories listed in Rule 12(f).[113] "Immaterial" matter "has no essential or important relationship to [any] claim[s] for relief."[114] "Impertinent" matter consists of "statements that do not pertain, and are not necessary, to the issues in question."[115] And "scandalous" matter "casts a derogatory light on someone, uses repulsive language, or detracts from the dignity of the court."[116]

Having determined Tray's allegations are really about the Devon Entities' breach of contract, we agree with the Devon Entities the references to "scammers and con artists" and

"fraudulent actors" cast the Devon Entities in a derogatory light, and the reference to the FBI press release is impertinent and unnecessary to the issues in question. We strike paragraphs one and two from the amended Complaint. But we do not find the fact of the COVID-19 pandemic to be "immaterial" or "impertinent" to this case because we find it provides important context for the parties' expectations regarding timely delivery of the PPE. The parties should not to construe our striking paragraphs one and two as prohibiting future mention of the COVID-19 pandemic in their filings or at trial.

## III.    Conclusion

We dismiss all claims against Dr. Bennett. We further dismiss Tray's claims against the Devon Entities for fraud, negligent misrepresentation, and conversion. We do not dismiss the unjust enrichment claims. We further strike paragraphs one and two of the amended Complaint. We do not address Ms. DiRocco's motion to dismiss for lack of personal jurisdiction and insufficient service of process at this stage. [117]

---

[1] ECF Doc. No. 1 at 1. We refer to all three collectively as the Devon Entities.

[2] *Id.* ¶ 16.

[3] *Id.* ¶ 21.

[4] *Id.* ¶ 24.

[5] *Id.* ¶¶ 9-11.

[6] *Id.* ¶ 6.

[7] *Id.* ¶ 18.

[8] *Id.* ¶ 32.

[9] *Id.* ¶ 40.

[10] *Id.* ¶ 41.

[11] *Id.* ¶ 42.

[12] *Id.* ¶ 43.

[13] *Id.* ¶ 44.

[14] *Id.* ¶ 45.

[15] *Id.*

[16] *Id.* ¶ 46.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.* ¶¶ 51-53.

[22] *See* ECF Doc. No. 19 at 2-8.

[23] *Id.* at 9.

[24] *Foulke v. Dugan*, 187 F. Supp. 2d 253, 257 (E.D. Pa. 2002) (citing *Klaxon Co. v. Stenton Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

[25] *See Pasternack v. Klein*, No. 14-2275, 2017 WL 10810183, at *7 (E.D. Pa. July 24, 2017); *McElroy v. FirstEnergy Corp*, 824 Fed. App'x 97, 99 (3d. Cir. 2020).

[26] ECF Doc. No. 4 ¶¶ 9-11.

[27] *Lieberman v. Corporacion Experienca Unica S.A.*, 226 F. Supp, 3d 451 (E.D. Pa. 2016) (quoting *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1520-21 (3d Cir. 1994)).

[28] *Ashley v. Ashley,* 393 A.2d 637, 641 (Pa. 1978).

[29] *Accurso v. Infra-Red Servs., Inc.*, 23 F. Supp. 3d 494, 509 (E.D. Pa. 2014).

[30] *Id.*

[31] *Siematic Mobelwerke GmbH & Co. KG v. Siematic Corp.,* 643 F.Supp.2d 675, 695 (E.D.Pa. 2009) (quoting *Trustees, Nat'l Elevator Indus. Pension v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003)).

[32] *Accurso*, 23 F. Supp. 3d at 510 (quoting *Cent. Transp., LLC v. Atlas Towing, Inc.*, 884 F. Supp. 2d 207, 217 (E.D. Pa. 2012)).

[33] 700 F. Supp. 2d 720 (W.D. Pa. 2010).

[34] *Id.* at 725, 736.

[35] *Id.* at 736.

[36] *Id.*

[37] *Id.*

[38] *Id.* at 738.

[39] *Id.*

[40] No. 13-5634, 2015 WL 70921, at *1 (E.D. Pa. Jan. 5, 2015).

[41] *Id.* After discovery, the plaintiff amended the complaint to add more specific allegations supporting piercing the corporate veil to impose liability on Dr. Bennett and amended again to add claims against Ms. DiRocco. *Id.* at *3. Judge Baylson allowed the amendments and the claims against Dr. Bennett and Ms. DiRocco to then proceed in discovery. *Id.*

[42] ECF Doc. No. 4 ¶¶ 15, 17, 22, 24, 26.

[43] None of the Devon Entities have moved to dismiss the claims against them.

[44] ECF Doc. No. 4 ¶ 25.

[45] *Lutyk,* 332 F.3d at 195.

[46] *See infra*, Part III.B.

[47] *Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86, 90 (Pa. 1983).

[48] *Id.* (citations omitted).

[49] *See Walsh v. Alarm Sec. Grp. Inc.*, 95 Fed. App'x 399, 402 (3d Cir. 2004).

[50] *Id.* (citations omitted).

[51] *Id.* (quoting *Bala Corp. v. McGlinn*, 144 A. 823, 824 (Pa. 1929)).

[52] ECF Doc. No. 4 ¶ 18.

[53] *Id.* ¶ 32.

[54] *Id.* ¶ 35, 38.

[55] *Id.* ¶ 40.

[56] *Panthera Rail Car LLC v. Kasgro Rail Corp.*, 985 F. Supp. 2d 677, 696 (W.D. Pa. 2013).

[57] *Id.* (quoting *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007)).

[58] *Id.* (quoting *Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006)).

[59] *Id.* (citing *Hammersmith*, 480 F.3d at 230).

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Dixon v. Northwestern Mutual Ins.*, 146 A.3d 780 (Pa. Super. Ct. 2016).

[68] *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 53 (Pa. 2014).

[69] *Id.*

[70] 725 A.2d 1053, 1058 (Md. 1999).

[71] *Id.*

[72] *Id.* (quoting *Wilmington Trust Co. v. Clark*, 424 A.2d 744, 754 (Md. 1981)).

[73] *Id.* at 1059.

[74] *Bruno,* 106 A.3d at 53; *see also Smith v. Univ. of Pa.*, No. 20-2086, 2021 WL 1539493, at *9 (E.D. Pa. Apr. 20, 2021).

[75] *Downs v. Andrews*, 639 Fed App'x 816, 819 (3d Cir. 2016) (quoting *Pediatrix Screening, Inc. v. Telechem Int'l Inc.*, 602 F.3d 541, 550 (3d Cir. 2010), *overruled on other grounds by Ortiz v. Jordan*, 562 U.S. 180 (2011)).

[76] 639 Fed. App'x 816 (3d Cir. 2016).

[77] *Id.* at 817.

[78] *Id.* at 818.

[79] *Id.*

[80] *Id.*

[81] *Id.* at 820.

[82] *Id.* at 819-20.

[83] *Id.* at 820.

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] *Id.*

[89] 990 F.3d 310 (3d Cir. 2021).

[90] *Id.* at 311-12.

[91] *Id.* at 311.

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *Id.* at 315.

[97] *Id.*

[98] ECF Doc. No. 9-1 at 14.

[99] ECF Doc. No. 16 at 15, 18.

[100] Neither party finds a conflict between Maryland and Pennsylvania law regarding the applicability of unjust enrichment in this case or regarding the elements of unjust enrichment, nor do we.

[101] 955 F. Supp. 2d 452, 460 (E.D. Pa. 2013).

[102] *Id.* (quoting *Wilson Area Sch. Dist. v. Skepton,* 895 A.2d 1250 (Pa. 2006)).

[103] *Id.*

[104] *Id.* (quoting *Brown & Brown, Inc. v. Cola,* 745 F.Supp.2d 588, 626 (E.D.Pa.2010)).

[105] ECF Doc. No. 4 ¶ 1.

[106] *Id.* ¶ 2.

[107] Fed. R. Civ. P. 12(f).

[108] *Castelli-Velez*, 2021 WL 978814, at *2 (quoting 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER FEDERAL PRACTICE AND PROCEDURE § 1380 (3d ed. 2020 update)).

[109] *Id.* (quoting *United States v. Educ. Mgmt. Corp.*, 871 F. Supp. 2d 433, 460 (W.D. Pa. 2012).

[110] *Id.* (citation omitted).

[111] *Id.* (citation omitted).

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] *Id.*

[116] *Id.*

[117] Ms. DiRocco separately moves to dismiss for insufficient service of process and lack of personal jurisdiction. We do not address her motion in this Memorandum but trust Tray's counsel will be mindful of this Memorandum before expending time and costs for all counsel in pursuing jurisdictional discovery to respond to Ms. DiRocco's motion.